UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Case No. 09 B 26595 |
| | ) | |
| JERZY ADAS and TERESA | ) | |
| SZMACINSKA-ADAS, | ) | |
| | ) | Chapter 7 |
| Debtors. | ) | |
| | ) | |
| | ) | |
| ZENON RUTKOWSKI, | ) | |
| | ) | Adv. No. 09 A 1045 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Judge Pamela S. Hollis |
| JERZY ADAS, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

This matter comes before the court following trial on the complaint filed by Zenon

Rutkowski against Jerzy Adas.  In his complaint, Rutkowski seeks a finding that Adas' debt to

him is nondischargeable under both 11 U.S.C. §§ 523(a)(2)(A) and (a)(4).  Rutkowski's post-

trial brief, however, refers only to § 523(a)(4).  Having heard the testimony of witnesses and

reviewed the exhibits admitted into evidence, the court enters judgment for Rutkowski.  The debt

Adas owes to Rutkowski is nondischargeable pursuant to 11 U.S.C. § 523(a)(4).  The court

makes no finding as to whether the debt is nondischargeable pursuant to § 523(a)(2).

## FINDINGS OF FACT

Zenon Rutkowski Meets Jerzy Adas, a Successful Contractor, and a Close Friendship Develops

Jerzy Adas left Poland in 1992 and came to the United States, already having acquired

several years of construction experience.  In 1995, Adas started A&L Construction with a

partner. Initially, his business was remodeling, painting and constructing additions. He changed the name of the business to Adas Construction in 1997, the year in which he became the sole owner of the business. Tr. 11/8/11 at 5-7.[1]

Adas eventually decided to expand into homebuilding. The first home he built was his own in Glenview, Illinois, finishing construction in 1998. He built another home in Glenview in 2000 or 2001, also in excess of 3500 square feet, and a third home about the same size in Des Plaines, Illinois, in 2001-2003. Tr. 11/8/11 at 9-11. His business was successful, and Adas had many of the accompanying trappings of success with his beautiful custom-built home, multiple yearly vacations and new car. Tr. 11/10/11 at 44.

Adas and Rutkowski met in 2003 or 2004, at a Polish school their children were attending. They became close friends, visiting each other's home many times. Their children played together, the families spent holidays with each other and traveled together, and a close personal friendship developed. Adas introduced Rutkowski to other friends, and vice versa. Tr. 11/8/11 at 15-17.

Rutkowski had also emigrated from Poland but had a different career path than Adas. Rutkowski started work in the United States as a security guard, then became a machine operator and later a tool and die designer. Tr. 11/10/11 at 42-43.

Adas and Rutkowski Decide to Invest Together in a Project to Build a New House

In 2005, Adas and Rutkowski started talking about investing in real estate. Tr. 11/8/11 at 18. Adas knew Rutkowski had no experience in construction or in real estate, besides buying his condominium and then, after selling the condominium, purchasing a small house in Wheeling. Tr. 11/8/11 at 18. But Rutkowski had money available from the sale of his condominium, was

---

[1] Tr. 11/xx/11 at __ refers to the official transcript of the trial held on November 8, 9, 10 and 30, 2011. Citations to the transcript for November 9 indicate whether it was the morning or afternoon session.

considering a number of possible investments, and knew that Adas had experience in the

industry:

> What I [Rutkowski] recall, for example, is that in his house – and the
> neighbor was actually building a house. He [Adas] took me over. There was only
> – basically a – you know, the foundation was only there.

> He explain to me everything, what's about, where supposed to – you
> know, what kind – what kind of wall supposed to go, where would be the brick
> laid out, and what's, you know, the excavation and so about – so he knew the, you
> know, construction of the houses very well. I was actually surprised at that time
> that he knew it that well, and I was really reassured.

Tr. 11/30/11 at 30, line 23 – 31, line 9.

Adas was about to start constructing a new house, and he twice took Rutkowski and his

wife out to Lake Bluff, Illinois. The first time out, the friends drove around and viewed

properties. Tr. 11/10/11 at 48-49. The second time, Adas took the Rutkowskis to see two lots,

and told them that he, Adas, was interested in these properties. He had looked at many parcels of

real estate previously, but the prices were always too high. Tr. 11/8/11 at 18-20. Rutkowski had

never even heard of Lake Bluff. Tr. 11/10/11 at 49.

One parcel was on Plaister Street. Adas eventually bought that property with someone

named Andrzejuk. Tr. 11/8/11 at 23. As for the parcel on Safford Place, there was already new

construction on the street, as well as a lot on which another homeowner was about to build. Tr.

11/8/11 at 24. The list price was around $360,000; Adas told Rutkowski it would be a good deal

at any price less than $300,000. Tr. 11/8/11 at 23. Adas believed Safford was a better location

than Plaister and that this would be a very good purchase. He "probably" told Rutkowski so. Tr.

11/8/11 at 24-25.

The Structure of Adas' and Rutkowski's Agreement

Adas and Rutkowski agreed to purchase the house on Safford, to tear it down and build a

new house. They agreed that Adas would do all building and construction work without

3

charging a general contractor fee. Tr. 11/8/11 at 21-22; Tr. 11/10/11 at 56. Rutkowski and Adas

also agreed that Rutkowski was to contribute whatever Adas needed for construction. Tr.

11/8/11 at 22. Adas would contribute 50% of the $50,000 down payment, since he "wanted

Zenon to feel all right when he comes to this deal." Tr. 11/8/11 at 21, lines 22-23. Rutkowski

stated that his "responsibility was clear, that I supposed [sic] to come up with the money,

possibly around 150,000, to start the construction on 914 Safford, and he [Adas] would handle

everything else." Tr. 11/10/11 at 55, lines 10-13.

At the end, they would split the profit. Tr. 11/8/11 at 22; Tr. 11/10/11 at 56-57. Adas

thought he could make between $100,000 and $150,000 for the two of them. Tr. 11/8/11 at 31-

32. In his experience, house prices rose 10 to 15% annually. Adas believed Safford was "a good

deal," and shared his opinion with Rutkowski. Tr. 11/8/11 at 32, lines 15-21.

Adas handled the negotiations for acquiring the house on Safford. Both Adas and

Rutkowski were listed as the buyers on the contract. **Pl. Ex. 1.** However, Adas "had a lot of

debt." Tr. 11/9/11 at 36, line 19 (afternoon session). He thought it would protect Rutkowski's

interests to be the sole owner, since Rutkowski would be responsible for the mortgage. "He

[Rutkowski] will be on the title, and this will be like a cover for him, I guess. I didn't know that

the market would – is going to nosedive." Tr. 11/8/11 at 28, lines 12-14.

Adas arranged for the mortgage on Safford with Fifth Third Bank. Tr. 11/8/11 at 22

("because I already did things like that"). On August 26, 2005, they acquired the Safford

property for $280,000. **Pl. Ex. 2.** Only Rutkowski was on the title.

Adas believed that he and Rutkowski were partners, even though Adas was not on the

title at Safford. They shook hands on the deal, although they had no written partnership

agreement. Tr. 11/8/11 at 34.

Adas began construction on Safford, using Rutkowski's funds. Adas was working on the Plaister Street project at the same time, and Rutkowski knew Adas was handling both projects simultaneously ("it was running a little bit in front, two months or so."). Tr. 11/10/11 at 104.

On April 18, 2006, Rutkowski wrote a check to Jerzy Adas in the amount of $16,000. See **Pl. Ex. 53**. Although the funds were to be used for construction on Safford, Adas deposited this check into his own personal account. Tr. 11/8/11 at 35. Adas was writing some checks for the Safford construction costs from his personal account. Id.

Adas and Rutkowski Need More Funds and Take Out a Construction Loan

Adas and Rutkowski both knew they needed additional money for construction, so Adas set up a meeting with mortgage broker Paul Darski. Tr. 11/8/11 at 39; Tr. 11/10/11 at 57-58. Adas had worked with Darski on other projects. Tr. 11/9/11 at 4 (afternoon session). At their meeting in his office, Darski made notes about the estimated costs of construction. Tr. 11/8/11 at 38; Tr. 11/10/11 at 58-59; **Pl. Ex. 48**. Based on these notes, made while Adas was present and at the table, Rutkowski eventually understood that the cost of construction would be approximately $400,000, Tr. 11/10/11 at 61, and that construction would take approximately one year, Tr. 11/10/11 at 76. The partners would also need $224,000 to pay off Fifth Third's mortgage. **Pl. Ex. 48.**[2]

Neither party called Paul Darski to testify at trial.

Darski eventually helped Adas and Rutkowski obtain their construction loan at Delaware Place Bank. The loan closed on November 10, 2006, in Darski's office. The settlement statement indicated paid waivers in the amount of $440,500, which Rutkowski believed to be the

---

[2] There is a multiplication error on this exhibit. It states that the cost of construction will be $100 per square foot, so that the cost of constructing this 3,500 square foot house will be $250,000. The correct figure is $350,000. This error was acknowledged during the trial.

total cost of construction on Safford.  Tr. 11/10/11 at 96-97; **Pl. Ex. 3**.  Adas never explained that

figure to him.  Tr. 11/10/11 at 67-68.

<u>Adas Included Inflated Estimates on the Sworn Contractor's Statements Submitted in</u>
<u>Connection with the Construction Loan</u>

      In fact, $440,500 was the amount of work Adas claimed to have already completed on

Safford.  Adas submitted a "Sworn Statement for Contractor and Subcontractor to Owner &

Chicago Title" (hereinafter, "Sworn Contractor's Statement") to Delaware Place Bank dated

November 10, 2006, in which he stated that certain construction work totaling $440,500 had

been "furnished or are furnishing and preparing materials for . . . .  That this statement is a full,

true and complete statement of all such persons, the amounts paid and the amounts due or to

become due to each."  The notary public before whom Adas signed the Sworn Contractor's

Statement was Paul Darski.  **Pl. Ex. 7**.

      Adas admitted at trial that each of the following amounts on the Sworn Contractor's

Statement was inflated or exaggerated:

| Type of Work | Cost on Statement | Testimony in bold, *questions italicized* |
|---|---|---|
| Demolition | $36,000 | **"I didn't pay that much. . . . Right now, I don't remember how much."** *"So you paid [Rebacz] 4,400 for demolition and you listed the cost of demolition at $36,000?* **Yes."** |
| Waste Removal | $24,000 | *"So that's about $9,500?* **Yes.** *You didn't pay $24,000 for waste removal, did you?* **No."** |
| Carpentry | $99,000 | *"You never paid anybody – it's not going to – individually or in total $99,000 for carpentry, did you?* **I did not, no."** |
| Excavation | $38,000 | *"He also did that, and that's $8,000?* **Yes.** *You didn't pay $38,000 for demolition [sic] work, did you?* **No."** |
| Foundation | $79,000 | *"And you paid [Flores Concrete] $30,000, correct?* **Possibly. I'm pretty sure I paid them more. I believe –** *When your checks – 34,000. – your checks show that you paid them $30,000. . . . in any event, you didn't pay $79,000 for foundation work?* **No."** |

| Lumber | $48,000 | *"So those totals don't come anywhere as close to the $48,000 that you swore was true and correct?* **You're right, they're not.**" |
| Roofing | $36,000 | *"And item 66 shows $7,000 for roofing. Yes. You claimed, however, in a sworn statement under oath that it was $36,000.* **Yes.**" |
| Windows | $55,000 | *"So you only spent a total of around twenty-one thousand three or four hundred dollars for windows?* **Yes.**" |
| Plans | $10,000 | *"Weren't the architectural plans actually $6,000?* **Yes.** *So you inflated that too?* **Yes.**" |

Tr. 11/9/11 at 47-56 (morning session).

Indeed, Adas continued to include inflated amounts on the subsequent Sworn

Contractor's Statements he submitted each time he sought a draw on the construction loan:

Q:    You're continuing [sic] to submit sworn statements with hugely inflated amounts?

A:    Yes.

Q:    And that goes all the way through the last statement, which is Plaintiff's Ex. 14.

A:    Yes.

Tr. 11/9/11 at 58, lines 2-6 (morning session). See **Pl. Exs. 8-14**.

If Rutkowski had known Adas submitted inflated estimates to the title company, he

would not have signed anything at the closing. Instead, he would have gone "out and seek an

advice [sic] from somebody else, possibly." Tr. 11/10/11 at 68, line 20. Rutkowski considered

hiring an attorney, since he had one represent him at the closings on his condominium and house,

but "Paul Darski said basically that's a waste of money." Tr. 11/10/11 at 69, lines 3-4.

Delaware Place Bank loan officer Sharon Liska would not have approved the draws on

the construction loan if she had known Adas was submitting inflated requests. Tr. 11/10/11 at

29-31. However, Liska or a third party hired by Delaware Place Bank went out to Lake Bluff

several times to inspect the Safford property and to ensure that the work described in the Sworn

Contractor's Statements had been completed. Tr. 11/10/11. Only once did Delaware Place Bank

reject a disbursement request. Tr. 11/10/11 at 13.

Liska contacted both Rutkowski and Adas to ask whether there were any subcontractors

working on Safford. Adas told her "[t]hat everything was being ran through his company." Tr.

11/10/11 at 37, line 25 – 38, line 1. And Rutkowski told Liska that it was their agreement to do

it this way, since Adas Construction was the general contractor and "everything was funneling, I

guess would be a proper word, through that business name." Tr. 11/10/11 at 39, lines 19-20.

The first time Rutkowski saw the Sworn Contractor's Statements was when his attorney emailed

copies to him. Tr. 11/10/11 at 70.

## Adas Agreed That the Funds From Rutkowski and From Delaware Place Bank Would be Used Only for Building the House on Safford

Adas told Rutkowski that he would use all the funds he received just for building the

house on Safford. He wouldn't take a contractor's fee, or use it to pay his home mortgage, or for

personal expenses. All of the money he received both from Rutkowski and from Delaware Place

Bank would be used for the construction of Safford, and nothing else.

Q:    Did you get a construction loan at Delaware Place Bank?

A:    Yes. . . .

Q:    Do you recognize [Pl. Ex. 3] as the closing statement for the construction loan?

A:    Yes.

Q:    You told Zenon, didn't you, that you would use that money just for the construction of Safford; isn't that right?

A:    Yes.

Q:    That you wouldn't take any contractor's fee?

A:    Yes.

Q:    You wouldn't use it for your family expenses?

A:   Yes.

Q:   You wouldn't use it to pay your home mortgage?

A:   Yes.

Q:   And was the same true with the money that Zenon was investing?

A:   Yes.

Q:   So every penny you received was to be used for the construction of Safford and nothing else?

A:   Yes.

Tr. 11/8/11 at 33, line 4 – 34, line 11.

Rutkowski would not have gone ahead with the construction loan if he knew Adas might use the funds for Plaister, or for anything other than constructing the house on Safford:

Q:   Would you have gone ahead with the construction loan if Mr. Adas had said that you could – that he might use the money for Plaister?

A:   No.

Q:   Or he might use the money for his own living expenses?

A:   No.  It's pretty obvious here.

Tr. 11/10/11 at 70, lines 6-12.

Construction of the House on Safford is Complete, But Funds Are Unaccounted For

Adas completed construction on Safford in April 2008.  An appraisal with an effective date of April 1, 2008, valued the house at $950,000.  **Def. Ex. 14**.  A certificate of occupancy was issued on June 18, 2008.  **Def. Ex. 15**.

By this time, the balance due on the construction loan had increased significantly. Although he had been receiving statements from Delaware Place Bank all along, Rutkowski became concerned about the loan at the end of 2007.  It had been his expectation that the house would take a year to build from the time the construction loan closed in November 2006:

9

Q:    Did Mr. Adas at any time give you his opinion as to how long it would take to construct the house?

A:    Yes.

Q:    What did he tell you?

A:    Basically, that totally, that once we get the construction loan, within a year, we will be finished with it and he actually supported it with his statement that the interest wouldn't be used.  So it was clear to me that within a year, we'll be done, so to speak, the construction completed.

Tr. 11/10/11 at 76, lines 10-20.

Rutkowski asked Adas for an accounting of construction costs five times between the end of 2007 and August 2008.  Tr. 11/10/11 at 78.  Eventually, Adas signed a document acknowledging that he received $603,200 as of September 19, 2008.  **Pl. Ex. 5.**

In response to Rutkowski's request for an accounting, Adas gave him a five page handwritten statement that the actual costs for Safford were $454,767.90.  **Pl. Ex. 6.**  This figure may be higher by two or three thousand dollars.

The difference between the $603,200 that Adas received and the $454,767.90 that Adas claims to have spent on Safford is $145,432.10.  Rutkowski asked Adas what happened to the money.  "He basically said nothing.  He had no answer to that." Tr. 11/10/11 at 82, lines 14-15.

Adas told Rutkowski he would need to perform a professional accounting in order to figure out what happened to the missing $145,432.10.  In the end, however, Adas provided no accounting to Rutkowski other than **Pl. Ex. 6.**  Tr. 11/8/11 at 49-50.

Adas Commingled Business and Personal Funds

On July 31, 2006, Stewart Title Company of Illinois issued a check to Adas and Janusz Andrzejuk in the amount of $128,905.92.  See **Pl. Ex. 38.**  Andrzejuk endorsed that check to Adas for construction costs on Plaister.  Adas then deposited that check in his personal account at MidAmerica Bank.

Adas kept two separate corporate bank accounts for Adas Construction, one at MidAmerica and another at MB Financial. Tr. 11/8/11 at 51. After November 10, 2006 (when the construction loan was funded), Adas paid himself $188,640.36 from the MB Financial account and $106,330 from the Mid America account. **Pl. Exs. 30 and 32; Sch. 5 to Pl. Post-Trial Brief**. Adas continued to write checks to himself from the corporate accounts even as his "business was beginning to fade." Tr. 11/8/11 at 53, lines 15-16; Tr. 11/8/11 at 13-14. Adas took money from a corporate account to pay the attorney who handled his and his wife's personal bankruptcy case. Tr. 11/8/11 at 54.

Adas' Check-Writing and Record-Keeping Practices Regarding the Safford Project

Adas' practice was to write checks as needed and to note on the face of the check which project the check was for. If he wrote both Plaister and Safford, the cost would be allocated between the projects. Tr. 11/8/11 at 82. Copies of the checks written to cover construction costs on Safford were submitted as **Def. Ex. 6**.

Adas altered some of the copies of checks that he submitted in discovery, making the alterations "at the time when I was doing my accounting. . . . After I received this notice from court from them, I did a summary." Tr. 11/8/11 at 68, lines 18-23. Adas crossed out "Plaister" on the check copy – included as part of **Def. Ex. 6** -- when the check said "Plaister/Safford" at the time it was deposited by the subcontractor. The following checks were altered after they cleared the bank but before they were submitted as evidence:

On December 8, 2006, Adas wrote a check to Baciar Construction in the amount of $10,000. **Def. Ex. 6**, JA 354. He originally wrote "Plaister plus Safford" on the check. Tr. 11/8/11 at 65. On the copy of the check submitted in discovery, Adas scratched out the word "Plaister." Id.; **Pl. Ex. 30**, MB 136.

On June 8, 2007, Adas wrote a check to Czaicki's Noble Furniture for $8,000. **Def. Ex. 6**, JA 392. He originally wrote "Safford plus Plaister" on the check. Tr. 11/8/11 at 65. Sometime later, he crossed out Plaister. **Pl. Ex. 30**, MB 169.

On December 28, 2007, Adas wrote another check to Czaicki's Noble Furniture,[3] this time for $10,000. **Def. Ex. 6**, JA 419. Again, he scratched out the word "Plaister" on the copy even though it was on the original check. Tr. 11/8/11 at 66; **Pl. Ex. 30**, MB 200.

Adas wrote a check for $1,130.28 to Hillside Lumber on December 22, 2006. **Def. Ex. 6**, JA 361. He originally wrote "Plaister" on the check. In contrast to the checks written to Baciar Construction and Czaicki's Noble Furniture, Adas crossed out "Plaister" before giving the check to his subcontractor, and before it cleared the bank. Tr. 11/8/11 at 74. "Safford" was on the copy submitted to the court. **Pl. Ex. 30**, MB 138.

Adas kept a book with notes regarding the individuals who worked for him, how many hours they worked each week, and whether they had been paid. **Def. Ex. 8**. He reviewed these notes in order to determine how much work was done on Safford. Tr. 11/9/11 at 6-7 (morning session). Although he issued W-2 forms to his workers, Adas made no withholdings for federal income tax, state income tax, Social Security or Medicare. Additionally, he never paid overtime. Tr. 11/9/11 at 8 (morning session).

Adas worked on several different projects at the same time he worked on Safford:

A:      As I said, I was trying to work on other projects in the meantime. Because I didn't expect a lot of profit while building a house. Only after, I said.

Q:      But you were working on many other projects at the same time; is that right?

A:      Yes.

Tr. 11/9/11 at 34, lines 6-12 (morning session).

---

[3] This check's payee is Czaicki Nobel [sic] Furniture.

Adas submitted the receipts that support his claim that a particular expense was incurred on the Safford project at **Def. Ex. 7**. Adas kept the receipts for Safford organized by writing a note on the back of each receipt. Tr. 11/9/11 at 12 (morning session). Only copies of the front of the receipts were produced to the court, although Adas still has the originals. Tr. 11/9/11 at 12-13 (morning session).

On November 16, 2007, there are two receipts from Home Depot with time stamps just one minute apart. **Def. Ex. 7**, JA 186 and 191. Adas had two projects going at the time, the Safford house and a project in Wilmette, Illinois, but it was "impossible for me to purchase door stops for any other job except this one [Safford]." Tr. 11/9/11 at 30, lines 19-20 (morning session). Adas produced three Home Depot receipts for June 13, 2008. Two receipts are from the Vernon Hills location, which is the closest Home Depot to the Safford project, and are time stamped 19 minutes apart. **Def. Ex. 7**, JA 180. "Sometimes it's like this. I'm going to the store, I'm leaving the store. I'm on my way to the job site, and one of my employees are calling me. We need something, we need something more. So I make a U-turn and I go back to the store." Tr. 11/9/11 at 18, lines 14-18 (morning session). Adas made nearly all the purchases for Safford himself – "[m]ost of the time, 99 percent, I did." Tr. 11/9/11 at 25, line 15 (morning session). The third receipt on June 13, 2008, is time stamped two and a half hours later, from the Home Depot store in Waukegan, Illinois. **Def. Ex. 7**, JA 176. Adas initially speculated that he traveled to Waukegan because he had some business there.

> Q:  Isn't it more likely, Mr. Adas, that the reason you have three separate receipts is that you were buying materials or products for three separate projects?
>
> A:  Yes, it's possible. Because as I mentioned, I told you before, I always took notes.
>
> Q:  Thank you. But your answer is yes, it's possible?
>
> A:  Yes.

Tr. 11/9/11 at 19, lines 8-16 (morning session).

On March 4, 2008, there is a receipt from the Home Depot at 1232 West North Avenue in Chicago, Illinois. **Def. Ex. 7**, JA 175. Although this Home Depot store is the closest location to the Larrabee Street project in Chicago on which Adas was working at the time, and is geographically distant from Safford, and although Adas' book showed no employees working at Safford that day, Adas was positive that the items purchased that day were for Safford. Tr. 11/9/11 at 20-23 (morning session). Adas produced three Epco receipts for October 25, 2007, a date on which he was also working on projects at Mt. Vernon and Michigan Avenues. **Def. Ex. 7**, JA 90, 91, 92 and 93. Those purchases were made at the Epco store in Wilmette at 7:35 am, 12:48 pm and then 2:39 pm, but Adas claimed they were for the Safford project in Lake Bluff. Tr. 11/9/11 at 34 (morning session). The court takes judicial notices of the fact that Wilmette and Lake Bluff are approximately 19 miles apart. FRE 201.

Adas produced a receipt for a purchase made on October 4, 2007, **Def. Ex. 7**, JA 192, stating that it was for the Safford project. Adas worked at projects on Rosemary and on Grove that day, but not on Safford. Tr. 11/9/11 at 31-32 (morning session). Adas speculated at trial that subcontractors might have made purchases on the dates he had no employees working at Safford. "If they were short when it comes to materials, it was pretty much normal. It is normal." Tr. 11/9/11 at 17, lines 19-20 (morning session).

Q: But you said you were the one that was making these purchases 95 percent of the time?

A: Yes.

Tr. 11/9/11 at 32, lines 9-11 (morning session).

Finally, Adas produced a receipt for a purchase at Home Depot on March 6, 2007, **Def. Ex. 7**, JA 206, although his time records showed no work at Safford in March 2007. Instead, his

14

employees were working at a property on Circle.  Adas asserted at trial that this purchase was for

Safford "because I knew that my people are going to start working with those materials in a few

days.  It's possible that someone else made that purchase.  It is – judging by what was purchased,

it could have been a subcontractor, you know, and I was just paying for the materials."  Tr.

11/9/11 at 40, lines 1-6 (morning session).  Adas' book indicates that the first date his employees

worked at Safford after March 6 was April 7, more than a month later.

Rutkowski's Signature Was Forged on the Sworn Owner's Statements

Forensic document examiner James Hayes testified as an expert witness that in his

opinion, Rutkowski did not sign the Sworn Owner's Statements submitted to Delaware Place

Bank by which an additional $256,500 was drawn down from the construction loan. **Pl. Exs. 15-

20**.  Hayes did not conclude that Adas forged Rutkowski's signature, only that someone forged

it.

Hayes' testimony was interesting, but ultimately no findings of fact are required

regarding his conclusions.  Although Rutkowski urges the court to use common sense to find that

either Adas or Darski forged Rutkowski's signature, it is inappropriate to do so.  Hayes

concluded that there were not sufficient characteristics in the handwriting exemplars to render an

opinion as to whether Adas was the author of the questioned signatures.  On the question of

whether Adas forged Rutkowski's signature, the court will not substitute its judgment for a

handwriting expert's.

## CONCLUSIONS OF LAW

Rutkowski seeks a determination that Adas' debt to him is nondischargeable pursuant to

11 U.S.C. § 523(a)(4). Although he requested relief under § 523(a)(2) in his complaint, he did

not brief this request in either of his post-trial memoranda. Therefore, the court will consider

only whether the evidence presented supports a claim of nondischargeability under 11 U.S.C. §

523(a)(4), and considers the § 523(a)(2) count to be abandoned.

Rutkowski must prove his case by a preponderance of the evidence. Grogan v. Garner,

498 U.S. 279, 286-87 (1991). Exceptions to discharge are narrowly construed in favor of the

debtor. In re Chambers, 348 F. 3rd 650, 654 (7th Cir. 2003) (citations omitted). This is especially

true when the exception under consideration is § 523(a)(4). "The Supreme Court taught in Davis

v. Aetna Acceptance Co., 293 U.S. 328, 55 S.Ct. 151, 79 L.Ed. 393 (1934), that the non-

dischargeability exception's reference to fiduciary capacity was 'strict and narrow.' 293 U.S. at

333, 55 S.Ct. 151. As Justice Cardozo wrote for the Court, the debtor 'must have been a trustee

before the wrong and without reference thereto.' Id." In re Berman, 629 F. 3rd 761, 767-768 (7th

Cir. 2011) (footnote omitted explaining that the Supreme Court was interpreting a predecessor

statute).

Pursuant to 11 U.S.C. § 523(a)(4):

(a)    A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this
title does not discharge an individual debtor from any debt--

(4)    for fraud or defalcation while acting in a fiduciary capacity,
embezzlement, or larceny . . .

Rutkowski argues that as a partner (with an unwritten but understood agreement) with

superior knowledge and experience, as well as control over funds for their joint project, Adas

owed Rutkowski a fiduciary duty. If Adas committed fraud or defalcation while acting as a

fiduciary, his debt to Rutkowski is nondischargeable.

16

"To prevail under this theory a plaintiff must ordinarily establish existence of an express

trust or a fiduciary relationship and a debt caused by the debtor-defendant's defalcation while

acting as a fiduciary." In re Wish, 472 B.R. 763, 783 (Bankr. N.D. Ill. 2012) (citations omitted).

### Adas Was Acting in a Fiduciary Capacity

The first question is whether Adas was acting in a fiduciary capacity. There are two

situations in which a person may be acting in a fiduciary capacity. The first of these is where an

express trust exists.

### An Express Trust Did Not Exist

"Express trusts require an explicit declaration of trust, a clearly defined trust *res*, and an

intent to create a trust." CFC Wireforms, Inc. v. Monroe, 304 B.R. 349, 358 (Bankr. N.D. Ill.

2004) (citations omitted).

> Under Illinois law, an express trust exists where there is (1) intent to create a trust;
> (2) definite subject matter or trust property; (3) ascertainable beneficiaries; (4) a
> trustee; (5) specifications of a trust purpose; and (6) delivery of trust property to
> the trustee. If any of the necessary elements of a trust are not described with
> certainty, no trust is created. Express or technical trusts are formed by positive
> acts of both parties, typically manifested in writing by a deed, will, or other such
> agreement.

In re Boricich, 2011 WL 2600692, *4 (Bankr. N.D. Ill. June 29, 2011) (citations and

quotations omitted).

In this case, there was no written declaration of trust and no evidence of intent to

create a trust. Even if all of the required elements existed, they are described nowhere

with certainty. Without such a description, no trust is created.

Rutkowski urges the court to find an express trust as the court did in Green v. Pawlinski,

170 B.R. 380 (Bankr. N.D. Ill. 1994). In Pawlinski, the plaintiff gave debtor a $53,000 check to

use for purchasing two limousines. In return, the plaintiff received a receipt which stated:

"*Received* from Harry Green $53,000 (fifty three thousand dollars) *for the purchase of two 1985 Cadillac limousines.*" 170 B.R. at 384 (Emphasis added by the Pawlinski court.)

Debtor used the money to buy the two limousines, but did not title them in the plaintiff's name. Judge Schmetterer found the existence of an express trust to be "evidenced by the written receipt from Debtor and Gurich for the $53,000.00 check. It is clear that they receipted for monies to be held by them in trust for use in purchasing two limousines for Green with title in his name. They took the $53,000.00 under an acknowledged, express trust to do so." Id. at 389. Pawlinski is an example of a written declaration of trust described with certainty. Such is not the situation in the instant case. Neither does the evidence in this case demonstrate "[t]he intent to create a trust relationship, rather than a contractual relationship." Monroe, 304 B.R. at 358.

Moreover, the Seventh Circuit instructs us that the hallmarks of a trust include "[s]egregation of funds, management by financial intermediaries, and recognition that the entity in control of the assets has at most 'bare' legal title to them. . . . These real attributes . . . bring into play a fiduciary obligation." In re McGee, 353 F. 3rd 537, 540-41 (7th Cir. 2003) (citation omitted). None of these hallmarks were present here. Rutkowski has not demonstrated by a preponderance of the evidence that an express trust existed.

### A Fiduciary Relationship Existed Between Adas and Rutkowski Because of the Difference in Knowledge or Power Which Gave Adas a Position of Ascendency Over Rutkowski

Even if no express trust existed, "[a] fiduciary relationship may arise separate from an express trust." Monroe, 304 B.R. at 358 (citation omitted). Adas could have been acting in a fiduciary capacity if he had a fiduciary relationship with Rutkowski. If they had a fiduciary relationship, Adas was acting in a fiduciary capacity when he took Rutkowski's funds, and the court may consider whether his debt to Rutkowski was caused by a defalcation while acting as a

fiduciary. If they did not have a fiduciary relationship, the inquiry stops here and judgment must be entered for Adas.

Not all fiduciary obligations recognized by the law are encompassed by the word 'fiduciary' as it is used in § 523(a)(4). See Matter of Woldman, 92 F. 3rd 546, 547 (7th Cir. 1996). As stated above, the Supreme Court taught in 1934 that "the non-dischargeability exception's reference to fiduciary capacity was 'strict and narrow.'" Berman, 629 F. 3rd at 767. In this Circuit, part of that narrow interpretation is that general partners and parties to a joint venture are not fiduciaries when they are equals. See id. at 770; In re Frain, 230 F. 3rd 1014, 1017 (7th Cir. 2000).

Moreover, only those fiduciary relationships that "impose[] real duties in advance of the breach" qualify under the Bankruptcy Code. Matter of Marchiando, 13 F. 3rd 1111, 1116 (7th Cir.), cert. denied, 512 U.S. 1205 (1994). See Frain, 230 F. 3d at 1017. Adas's obligation to Rutkowski must have existed in advance of any wrongdoing.

> As Justice Cardozo wrote for the Court [in Davis v. Aetna Acceptance Co.], the debtor "must have been a trustee before the wrong and without reference thereto." Those facts are not present in a situation . . . where the corporation's breach of its contract created the debt. The resulting obligation to the creditor is not "turned into" one arising from a trust . . . Such obligations are "remote from the conventional trust or fiduciary setting, in which someone . . . in whom confidence is reposed is entrusted with another person's money for safekeeping."
>
> Berman, 629 F. 3rd 761, 767-68 (7th Cir. 2011) (citations and footnote omitted).

"The concept of a 'fiduciary relationship' under Section 523(a)(4) is ultimately a question of federal law and the broad, general definition under state law, as one involving confidence, trust and good faith, is not controlling in the dischargeability context." In re Sever, 438 B.R. 612, 628 (Bankr. C.D. Ill. 2010) (citation omitted).

What, then, is the key to finding whether a fiduciary relationship existed between two parties? The Seventh Circuit described the linchpin to fiduciary relationships thus:

The key to knitting the cases into a harmonious whole is the distinction . . . between a trust or other fiduciary relation that has an existence independent of the debtor's wrong and a trust or other fiduciary relation that has no existence before the wrong is committed. . . .

If we probe more deeply the distinction between the fiduciary relation that imposes real duties in advance of the breach and the fiduciary relation that does not we find that the first group of cases involve **a difference in knowledge or power between fiduciary and principal which . . . gives the former a position of ascendency over the latter**. The fiduciary may know much more by reason of professional status, or the relation may be one that requires the principal to repose a special confidence in the fiduciary; both factors are present in the case of a lawyer-client relation and also the relation between director and shareholder or managing partner and limited partner. Or the principal may be a child, lacking not only knowledge but also the power to act upon it. **These are all situations in which one party to the relation is incapable of monitoring the other's performance of his undertaking, and therefore the law does not treat the relation as a relation at arm's length between equals**.

Marchiando, 13 F.3rd at 1115-16 (emphasis added) (citations omitted). In Marchiando, no fiduciary relationship was found, because the proposed fiduciary had "no edge based on the possession of power or expertise." Id. at 116 (emphasis added).

As Adas argues in his brief, fiduciary relationships are narrowly construed because "in virtually every contract for services, and in most joint ventures, one party possesses skills, talents, or experience which the other lacks. That is, after all, the reason they contract or go into business together in the first place." The court has no dispute with the conclusion that "an ordinary principal-agent or buyer-seller relationship, without more, is not a fiduciary relationship under section 523(a)(4)." Berman, 629 F. 3rd at 771.

General partners or joint venturers are at one end of the "broad spectrum of fiduciary obligations." See Woldman, 92 F. 3rd at 547. At the other end are those cases "in which a trustee defrauds a child beneficiary or a lawyer defrauds a client or a general partner defrauds a limited partner." Id. (citations omitted). If Rutkowski and Adas were typical general partners or

ordinary joint venturers, that status would preclude judgment for Rutkowski because the parties in those relationships do not owe each other a fiduciary duty under § 523(a)(4).

Having reviewed and analyzed the facts presented, however, the court finds that the nature of their relationship was more akin to that of a limited partnership, where Adas was the general partner and Rutkowski the limited partner. Although Rutkowski and Adas did not memorialize this arrangement in writing, that omission is not fatal to this finding. In the Seventh Circuit it is the substance of a relationship that is far more important than the label. Even where the state has deemed a debtor to be a fiduciary "in order to enlarge the remedies for default," in our Circuit those debtors are not automatically fiduciaries for purposes of § 523(a)(4). Marchiando, 32 F. 3rd at 1115. Conversely, the lack of a formal limited partnership label does not preclude judgment for Rutkowski. It is necessary to consider the actual nature of this particular relationship by analyzing the evidence presented in court.

And the evidence presented leaves the court with no doubt that in this relationship, Adas functioned as would a general partner and Rutkowski as a limited partner. Adas had an "edge" over Rutkowski in their relationship. Adas testified proudly about his experience in real estate and his successful remodeling and construction projects. He built his own 3500 square foot house in 1998, and two more houses of approximately the same size in the next few years. He was knowledgeable about the construction business, having started working in that business in Poland in 1989 and forming a construction company with a partner in 1995. By 1997, and for over 10 years, he ran Adas Construction by himself.

Meanwhile, Rutkowski admitted he had no knowledge about real estate save for purchasing his residences, first a condominium and then a small house in Wheeling. Adas knew Rutkowski had no experience in real estate or in construction work. And Rutkowski relied on

Case 09-01045    Doc 88    Filed 03/07/13    Entered 03/07/13 12:39:25    Desc Main
Document        Page 22 of 33

Adas, especially after listening to Adas describe the progress of construction on a neighbor's house. "He explain to me everything . . . . I was actually surprised at that time that he knew it that well, and I was really reassured."

When Adas and Rutkowski decided to invest in real estate together, it was Adas who selected the properties they would visit. He explained to Rutkowski that he had already looked at other parcels, but the prices were too high. It was Adas who told Rutkowski why he thought these particular properties were favorable, why he believed one location in particular was better than the other, and why the property on Safford would be a good deal for any price below $300,000. Rutkowski contributed nothing except money and enthusiasm.

This relationship fits squarely into the definition of a fiduciary relationship that imposes duties in advance of a breach. The difference in knowledge between Adas and Rutkowski gave the former a position of ascendency over the latter. Adas knew more by virtue of his experience in the real estate industry with projects similar to this one – purchasing a parcel of property and building a new house for sale. He invited Rutkowski many times to the large, beautiful home he built for himself, a keen reminder of his success each time Rutkowski entered it.

Adas argues that the case of Dillon v. Riley presents a set of facts closely aligned with the instant situation, and compels a different result. 2005 WL 1346984 (Bankr. N.D. Ill. May 31, 2005). In Dillon, a mother and daughter gave the debtor, a close friend of the daughter's, a substantial amount of money to invest. The debtor had recently transitioned from the insurance business to the investment business, and the daughter testified that he told her he would invest their money in the acquisition of certain entities. In contrast, the debtor testified that he did not make any representations as to a limitation on the use of the invested funds.

Judge Squires concluded that the mother and daughter had presented no evidence to suggest that the debtor was a fiduciary. "The fact that the Plaintiffs loaned or invested money with the Debtor and relied on him and listened to his suggestions does not give rise to a fiduciary duty for purposes of § 523(a)(4)." Id. at *10. In fact, "the Debtor was not in a position of ascendancy over the Plaintiffs. " Id.

Although the existence of a close friendship is present in both Dillon v. Riley and the instant case, there are some key differences. Adas testified that he told Rutkowski that the money Rutkowski invested and the funds drawn from the Delaware Place Bank construction loan would be used only for construction on Safford. Rutkowski was on the title for the Safford house. Adas had many years of experience in the construction industry, unlike the Dillon debtor who had just quit the insurance business to begin investing.

This relationship required Rutkowski to repose a special confidence in Adas. Knowing nothing of what was required to purchase and build new construction, Rutkowski had to place his trust in Adas at the very beginning of the investment, well before the actions that created the debt. As the Seventh Circuit describes it, this was a "situation[] in which one party to the relation is incapable of monitoring the other's performance of his undertaking, and therefore the law does not treat the relation as a relation at arm's length between equals." Marchiando, 13 F.3rd at 1116. Under the law in the Seventh Circuit, Adas and Rutkowski had a fiduciary relationship, and thus Adas was acting in a fiduciary capacity.

Adas' Debt to Rutkowski Was Caused by His Defalcation While Acting in a Fiduciary Capacity

Having found a fiduciary relationship between the parties which existed in advance of any breach, the final question the court must decide is whether Adas' debt to Rutkowski was caused by fraud or defalcation. Rutkowski does not assert that Adas defrauded him, and there was no showing that Adas entered the relationship with Rutkowski intending to defraud him.

Indeed, the court found credible Adas' claim that this was intended to be a money-making

project and that he and Rutkowski would split the profits. See Woldman, 92 F. 3rd at 547 ("So

far we have assumed (with the parties) that this really is a case of fraud, but actually it is better

described as defalcation, for there is no indication that Woldman intended from the beginning to

keep Nye's half of any fees that the lawsuit might generate."). But when Rutkowski began

demanding an account of the funds that were to be used only for construction of the Safford

house, Adas could not account for their disposition.

Therefore, the court will analyze whether Rutkowski proved defalcation by a

preponderance of the evidence.

In our Circuit, a finding of defalcation requires more than "a mere negligent breach of a

fiduciary duty." Meyer v. Rigdon, 36 F. 3rd 1375, 1384-85 (7th Cir. 1994) (discussing defalcation

in the context of § 523(a)(11)).

> Defalcation is not defined in the Bankruptcy Code. One court has defined
> defalcation within the context of Section 523(a)(4) as "the misappropriation of
> trust funds held in any fiduciary capacity and the failure to properly account for
> such funds. Although the Seventh Circuit has not clearly defined the level of
> tortious conduct necessary to constitute a defalcation in the context of §
> 523(a)(4), it has required something more than mere negligence or mistake, but less than
> fraud. Some degree of culpability is required to make a debt non-dischargeable as
> a defalcation under § 523(a)(4), and a debtor's knowledge is irrelevant."

> Norton v. Cole, 378 B.R. 215, 226 (Bankr. N.D. Ill. 2007) (citations omitted).

"In sum, defalcation in this context requires something more than mere negligence or

mistake, but does not require conduct rising to the level of actual fraud." ColeMichael

Investments, L.L.C. v. Burke, 436 B.R. 53, 62 (N.D. Ill. 2010) (citation omitted). Adas cites

Burke as an example of a case where the defendant committed a defalcation when he had not

only "not properly accounted for the funds," but also engaged in conduct that was "willful or

reckless." Id.

Adas admits that he is only able to account for approximately three-quarters of the funds entrusted to him. There is no dispute that he cannot account for more than $135,000 of the money he received from Rutkowski and Delaware Place Bank, which was to be used exclusively for construction of the house on Safford. Adas argues that the missing funds are not the result of reckless or willful conduct, but instead of his poor recordkeeping and the fact that he was overwhelmed with work – that he had bit off more than he could chew. This argument might be persuasive in a vacuum. But the evidence before the court paints a different picture, one of willful and reckless activity on the part of Adas.

The mere fact that funds are unaccounted for is not enough to find defalcation. Adas could have been negligent in his record-keeping, as he argues. But despite a lack of direct evidence of intent, the circumstances of this case compel a finding that Adas was more than negligent. In this case, in addition to the missing money, we have:

- Grossly inflated amounts included on the Sworn Contractor's Statements;

- Multiple daily receipts, some within minutes of each other, receipts from stores located far away from Safford and receipts for expenses incurred in a month when no work was done;

- Failure to withhold income and payroll taxes, and failure to pay overtime;

- Memo lines changed on three checks after they were requested in discovery;

- Checks meant for a business account deposited into a personal account;

- Withdrawing funds from a business account for personal use; and

- Witness demeanor at trial.

### Grossly inflated amounts included on the Sworn Contractor's Statements

First, Adas testified that he inflated all the figures on his Sworn Contractor's Statements, and not by a few dollars here and there. The Sworn Contractor's Statement dated November 10,

25

2006, listed work done or to be done in the amount of $440,500. Adas' testimony at trial
revealed that figure to be false by many, many thousands of dollars. For example, Adas wrote on
this statement that he spent or would be spending $48,000 on lumber. When confronted with the
assertion that the evidence showed that "those totals don't come anywhere as close to the
$48,000 that you swore was true and correct," Adas replied, "you're right, they're not." Adas
wrote on this statement that he spent or would be spending $55,000 on windows. When asked
"so you only spent a total of around twenty-one thousand three or four hundred dollars for
windows," Adas answered, "yes." Therefore, by virtue of sworn testimony from the Defendant
at trial, the court knows that Adas made false statements in connection with the funding of and
draws from the construction loan.

Liska testified that shortly after the first draw on the construction loan, she told
Rutkowski that Adas listed his own company as the subcontractor for every work item on the
Sworn Contractor's Statements. Rutkowski told her that it was their agreement to do this, since
Adas Construction would ultimately provide everything for the project. This is not an excuse for
the inflated figures. Instead, it is yet another misstatement on the Sworn Contractor's
Statements. Although neither Rutkowski nor Delaware Place Bank seemed to care very much, it
is cumulative evidence of Adas' recklessness.

> ### Multiple daily receipts, some within minutes of each other, receipts from stores located far away from Safford, and receipts for expenses incurred in a month when no work was done

Many of the receipts Adas submitted in Def. Ex. 7 were for multiple purchases made at
the same store, or various locations of the same store, on the same day but at different times.
Adas' explanation was that he or someone working for him would sometimes return to a store
three or four times in the same day, or that he would leave the store only to take a call from an
employee and need to turn around to make another purchase.

However, the sheer number of multiple same-day purchases, sometimes at stores far from the Safford location, raises concerns. For example, Adas produced two receipts dated November 16, 2007, with time stamps just one minute apart. On October 25, 2007, Adas made four separate purchases that he claims were for Safford, even though he was also working on projects at Mt. Vernon and Michigan Avenues, and even though three of the purchases were made at an Epco store that is approximately 19 miles away from Safford.

Adas submitted a receipt dated March 4, 2008, from the Home Depot at 1232 West North Avenue in Chicago. This Home Depot store is the closest location to the Larrabee Street project on which Adas was working at the time, and is even farther from Safford than the Epco store in Wilmette. Moreover, Adas' book showed no employees working at Safford that day. Adas made purchases in March and October 2007, even though he did not work at Safford at any time close to the date on which those purchases were made. To explain these purchases, Adas testified that he knew his employees would need the materials in a few days. That explanation conflicts with his practice of making multiple trips to the same store in a day as items were needed. He also speculated that perhaps subcontractors made the purchases, a response he repeated many times throughout his testimony. That explanation conflicts with his testimony that he bought the vast majority of the necessary supplies.

### Failure to withhold income and payroll taxes, and failure to pay overtime

Adas kept a book with notes regarding the individuals who worked for him, how many hours they worked each week, and whether they had been paid. He reviewed these notes in order to determine how much work was done on Safford. **Def. Ex. 8**. Although he issued W-2 to his workers, he made no withholdings for federal income tax, state income tax, Social Security or Medicare. Additionally, he never paid overtime. This proceeding is not a prosecution for unpaid

27

payroll taxes or for labor law violations, but Adas' failure to comply with these laws weighs against his credibility on other issues.

### Memo lines changed on three checks after they were requested in discovery

Adas' practice was to write checks as needed and to note on the face of the check which project the check was for. If he wrote both Plaister and Safford on the check, the cost would be allocated between the projects, and if he wrote neither, the check was for another project.

Adas admitted at trial that he altered some of the copies of checks that he submitted in discovery, and he admitted making the alterations after this lawsuit began. Rutkowski demonstrated at trial that Adas knew how to make a correction immediately, because the original of a check written to Hillside Lumber had "Plaister" crossed out. This immediate correction is not the sort of mistake that concerns the court. Instead, it is the negative inference that must be drawn from alterations to copies of checks months or years after they were written, but shortly after they were requested in discovery. It is unlikely that years after the fact, Adas realized that the check written to Baciar Construction for $10,000 and the two checks written to Czaicki's Noble Furniture for $8,000 and $10,000 were all for Safford, rather than allocated between the Safford and Plaister projects. As with his failure to make payroll tax withholdings or to pay overtime to his employees, these alterations call Adas' credibility into question and make it more likely that he acted willfully or recklessly with regard to the funds entrusted to him.

### Checks meant for a business account deposited into a personal account

Adas took two checks meant to be used for construction costs and deposited them into his personal bank account: the April 18, 2006 Rutkowski check in the amount of $16,000 and the July 31, 2006 Stewart Title check which Andrzejuk endorsed over to Adas. Adas attempted to explain these deposits by testifying that he was writing some checks for the Safford construction

28

costs from his personal account. This admission to mixing business and personal funds only strengthens the argument that Adas committed defalcation.

### Withdrawing funds from a business account for personal use

As Rutkowski described in his brief at Schedule 5, Adas withdrew $318,859 from his corporate accounts after November 10, 2006, writing checks directly to himself in various amounts. A copy of each check was included in Pl. Exs. 30 and 32. Adas continued to withdraw money from his corporate accounts for personal use even as his business was declining. He even paid his personal bankruptcy attorney from corporate funds. Again, these actions support the conclusion that Adas acted recklessly when he handled the funds meant only for construction of the Safford house.

### Witness demeanor at trial

The court heard testimony from Adas for several hours, during part or all of three separate days of trial. It had ample opportunity to observe his demeanor on the stand, his tone, his facial expressions, and his overall presentation. The court came away from the trial with the definite impression that Adas was dissembling at least some of the time during his testimony. Adas simply did not have the earnest and forthright manner of a credible witness. While the text of his testimony is clear from the transcript, Adas' manner is not, and it is that manner that raises the specter of doubt over the numerous times Adas claimed not to know something or not to remember an event, a person, or a fact.

This conclusion that Adas lacked credibility is in no way due to the fact that he testified through a translator, Tomasz Czeblakow. Mr. Czeblakow provided what appeared to be an excellent simultaneous translation, speaking rapidly enough to keep up with Adas but also

clearly and without hesitation. Czeblakow was easily understood and it appeared to the court that he added little or no inflection of his own.

### The Circumstances of this Case Combined With the Seven Factors Described Above Compel a Finding That Adas Acted Willfully or Recklessly With Regard to the Funds Entrusted to Him for Construction of the House on Safford

None of the reasons described above, standing alone, would result in a finding of defalcation. But the combination of these factors in conjunction with the funds whose disappearance Adas cannot explain leads inexorably to the conclusion that Adas' debt to Rutkowski was caused by more than negligence. Adas acted recklessly when it came to his handling of Rutkowski's funds, and his actions fit the definition of defalcation as outlined by the Seventh Circuit.

### The Court Will Not Enter a Money Judgment

The court need not determine the exact amount of Rutkowski's money judgment against Adas. It is sufficient to find that there was an amount of money that Rutkowski entrusted to Adas, both directly and through the construction loan, and that Adas owed Rutkowski a fiduciary duty with respect to those funds. Adas then committed a defalcation with regard to those funds, and consequently cannot account for their disposition.

Subject matter jurisdiction to decide a dischargeability dispute lies unquestionably with this court. Whether this court has subject matter jurisdiction to liquidate a nondischargeable claim and enter a final money judgment, however, is a question that splits the Circuits. See In re Cambio, 353 B.R. 30, 33-34 (B.A.P. 1st Cir. 2004) ("[T]he only effect of the money judgment against this [no-asset] debtor would be to enhance Mattera's future ability to collect the debt from Cambio's post-bankruptcy income and assets, with no effect at all on property of the bankruptcy estate or creditors' claims against the estate"). Compare Cowen v. Kennedy, 108 F. 3rd 1015 (9th Cir. 1997).

In our Circuit, the <u>Hallahan</u> panel wrote that "we think it preferable to allow bankruptcy courts ruling on the dischargeability of a debt to adjudicate the issues of liability and damages also." 936 F. 2d 1496, 1508 (7th Cir. 1991). This "accords with the rule generally followed by courts of equity that having jurisdiction of the parties to controversies brought before them, they will decide all matters in dispute and decree complete relief." <u>Id.</u> (quotation omitted).

Although <u>Hallahan</u> tells us that bankruptcy courts may enter a money judgment in dischargeability suits, it was written long before the Supreme Court issued <u>Stern v. Marshall</u>, ___ U.S. ___, 131 S. Ct. 2594, 180 L. Ed. 2d 475 (2011). Pursuant to <u>Stern</u>, even "where subject-matter jurisdiction indisputably exists, [we must ask] whether the bankruptcy court possesses the constitutional authority to enter final judgment." Nate Hull and Nicholas M. McGrath, "Liquidating Nondischargeable Claims after Stern v. Marshall," 31 Am. Bankr. Inst. J. 38 (November 2012).

> While the court's language in <u>Hallahan</u> certainly was a reasonable statement in 1935 and 1991, recent Supreme Court treatment of this subject has cast a much dimmer light on the power of non-Article III courts to render money judgments in dischargeability litigation.
> <u>In re Antonelli</u>, 2011 WL 5509494, 1 (Bankr. D.R.I. Nov. 10, 2011) (footnote omitted).

The <u>Antonelli</u> court followed the relevant precedent in its Circuit (<u>Cambio</u>) in determining that it did not have the power to issue a writ of execution in a dispute where the outcome would have no effect on the bankruptcy estate.

While this court is bound by the Seventh Circuit's holding in <u>Hallahan</u>, that decision does not <u>compel</u> entry of a money judgment by the bankruptcy court – it only acknowledges that subject matter jurisdiction to do so exists. And although at least one of the bankruptcy judges in this district determined that "the authority to enter a final dollar judgment as part of the adjudication of nondischargeability, as recognized in <u>Hallahan</u>, was not impaired by <u>Stern</u>," <u>In re</u>

Boricich, 464 B.R. 335, 337 (Bankr. N.D. Ill. 2011) (Schmetterer, J.), this court finds it more

appropriate to refrain from entry of a money judgment and to restrict its final judgment in this

proceeding to a finding of nondischargeability.  Since this is a no asset case, the amount of any

money judgment would have no effect on the estate or on a distribution to creditors.  See also In

re Deitz, 469 B.R. 11 (B.A.P. 9th Cir. 2012) (Markell, J., concurring) (raising multiple concerns

about the subject matter jurisdiction and constitutional power of a bankruptcy court to enter an

enforceable money judgment, but acknowledging that binding precedent in the Ninth Circuit can

only be reconsidered by the Circuit itself).

     Moreover, Hallahan reasoned that bankruptcy courts may rely on their genesis as courts

of equity when deciding questions of law.  A recent Seventh Circuit panel discouraged such

reliance.  Sunbeam Products, Inc. v. Chicago American Mfg., LLC, 686 F. 3rd 372, 375-76 (7th

Cir.) ("There are hundreds of bankruptcy judges, who have many different ideas about what is

equitable in any given situation . . . .  Rights depend, however, on what the Code provides rather

than on notions of equity."), cert. denied, 133 S. Ct. 790 (2012).  In light of the constitutional

questions that might arise – and which were not addressed by the parties although their briefs

were written post-Stern – the court will not enter a money judgment in a fixed amount.  Instead,

the court finds that the debt owed by Adas to Rutkowski, in whatever amount may be determined

in another forum, is a nondischargeable debt.

There is no question, however, of the court's jurisdiction and constitutional authority to enter a judgment on the question of dischargeability. For all of the reasons stated above, the court will enter judgment for Zenon Rutkowski on Count II of his complaint. The debt owed by Adas to Rutkowski is nondischargeable pursuant to 11 U.S.C. § 523(a)(4). The court makes no finding as to Count I.

Date:  MAR - 7 2013

PAMELA S. HOLLIS
United States Bankruptcy Judge